McMILLIAN, Circuit Judge,
dissenting.
I respectfully dissent from Part 11(B)(1) of the majority opinion insofar as it holds that Teterud v. Burns, 522 F.2d 357 (8th Cir.1975) {Teterud), is not dispositive of the hair length regulation issue under the compelling interest test. See majority op. at 1555 n. 11. Accordingly, if I were of the opinion that the Religious Freedom Restoration Act (RFRA) is constitutional, then I would affirm the district court’s holding that the hair length regulation violates federal law. However, for the reasons discussed below, I believe that RFRA is unconstitutional. Therefore, I would vacate the judgment of the district court and remand the case for further proceedings.
I.
Hamilton is an inmate at the Potosi Correctional Center (Potosi), a maximum security facility of the Missouri Department of Corrections. He filed this civil rights lawsuit after unsuccessfully pursuing prison grievance procedures. He claims that prison officials (hereinafter defendants) violated his First Amendment right to freely exercise his Native American religion. Hamilton, whose mother was of Choctaw descent, primarily contended that a prison grooming regulation prevented him from growing long hair and that defendants denied his request to build a sweat lodge in which to conduct religious ceremonies.
At the two-day evidentiary hearing held before the magistrate judge in March 1994, Hamilton submitted the deposition testimony of a number of prison officials from states other than Missouri. These officials testified as to their experience with sweat lodges and hair length regulation at their respective facilities. An assistant superintendent from a facility in Springfield, South Dakota, testified that they have had a sweat lodge since 1985 and that there have been no security problems or claims of sexual misconduct. Prison officials from Wisconsin and Iowa gave similar testimony as to their facilities’ experience with sweat lodges. With regard to hair *1558 length, prison officials from Iowa and South Dakota testified that their states’ penitentiaries have abandoned hair length regulation. Hamilton also submitted the deposition testimony of Chief Mato Wanagi Baldwin of the Menicongulakota Tribe. Chief Baldwin testified about the religious significance of the sweat lodge ceremony and the growing of long hair. His testimony corroborated Hamilton’s claim that a sweat lodge ceremony must be outside on the ground and that Native Americans traditionally wear their hair long and braided.
Following the evidentiary hearing, the magistrate judge issued a written report and recommendation. Hamilton v. Schriro, 863 F.Supp. 1019 (W.D.Mo.1994) (Report and Recommendation). In his evaluation of Hamilton’s claims, the magistrate judge expressly relied on RFRA, 42 U.S.C. § 2000bb4, which had become effective in November 1993, a few months before the hearing on Hamilton’s equitable claims. The magistrate judge specifically found that Hamilton’s religious beliefs were sincerely held and that the sweat lodge ceremony was an “essential component” of his Native American religion. Report and Recommendation at 4. The magistrate judge found defendants’ denial of Hamilton’s requests unreasonable because they did not
(1) make any inquiry of problems encountered by personnel at institutions which allow the practice of Native American religions; (2) contact any Native American religious leader to determine the feasibility of [Hamilton’s] requests, or to determine whether other acceptable alternatives existed; or (3) do a cost analysis or make inquiry regarding the availability of funds or the. amount of funds that would be required.
Id. at 1023. In essence, the magistrate judge concluded that defendants “made absolutely no effort to determine whether the religious practices could be accommodated while still taking care of safety and security concerns.” Id. The magistrate judge also found that the concerns about the smuggling of contraband and inmate identification with regard to hair length were overstated. Id. at 1023. Accordingly, the magistrate judge recommended that defendants be enjoined from enforcing hair length regulations against Hamilton and that “accommodations be made in accordance with the Religious Freedom Restoration Act to allow [Hamilton] to practice his Native American religion, including the right to have a weekly sweat lodge ceremony.” Id. at 1024.
The district court adopted the recommendation but modified it to require the parties to seek a compromise on the precise way to effectuate the remedy with regard to the sweat lodge ceremonies. Hamilton v. Schriro, 863 F.Supp. 1019 (W.D.Mo.1994) (publishing the full text of the magistrate judge’s report and recommendation). However, the parties were unable to resolve all of the issues. The parties could not agree on the location of the sweat lodge, and defendants wanted the sweat lodge to be available to all inmates, in accordance with their policy toward other religious services. The case was thus referred back to the magistrate judge who recommended a possible location for the sweat lodge and also recommended that
for six (6) months after the sweat lodge becomes operational and the ceremony is implemented, participation in the sweat lodge ceremony be limited to those who are sincere adherents of the Native American religion or to those who have been approved for participation by majority vote of Native Americans who practice the Native American religion and are scheduled to participate in the ceremony.
Slip op. at 2 (Sept. 8, 1994) (Report and Recommendation II). The district court adopted the recommendation on eligibility for participation in the sweat lodge ceremony verbatim and the other recommendations with only minor modifications. Id. (Oct. 21, 1994).
II.
Our court first heard oral argument in this case in May 1995. At that time, defendants did not challenge the constitutionality of RFRA. However, because of some concern over the district court’s treatment of the issue, we asked the parties to submit supplemental briefs. Defendants, in their supplemental brief, have argued that RFRA *1559 is unconstitutional. Shortly after the oral argument, the United States (the government) moved to intervene as plaintiff-inter-venor and also requested supplemental oral argument. We granted the government’s motion to intervene and heard supplemental argument from the parties in September 1995.
A.
As a threshold matter, I discuss my reasons for reaching the constitutionality of RFRA. Although neither party initially raised the constitutional issue on appeal, defendants did raise the issue before the magistrate judge. In the report and recommendation concluding that Hamilton was entitled to injunctive relief, the magistrate judge discussed the constitutionality of RFRA as follows:
The court is cognizant of defendants’ suggestion ... that the constitutionality of RFRA has not yet been determined. Section 5 of the fourteenth amendment encompasses the liberties guaranteed by the first amendment, [citation omitted] It follows, therefore, that Congress may enact laws enforcing the provisions of the first amendment. In the absence of compelling arguments or ease law indicating otherwise, this court will not further address this issue.
Report and Recommendation at 7. The district court’s order adopting the Report and Recommendation did not address the constitutional question. Although brief, the magistrate judge’s treatment of the issue clearly reaches the conclusion that § 5 of the Fourteenth Amendment provides Congress with a constitutional basis for the enactment of RFRA.
Although it appears the issue of RFRA’s constitutionality received limited consideration in the district court, we have previously held that “[i]t is not unfair to a trial court for an appellate court to decide a question that the trial court actually reached in its opinion, notwithstanding the fact that it was not argued by the parties.” Struempler v. Bowen, 822 F.2d 40, 42 (8th Cir.1987). Moreover, even where the district court has not considered an issue, “[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases.” Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). In the present case, the factual record has been fully developed, and the magistrate judge, although admittedly in passing, expressly upheld the constitutionality of RFRA. Under these circumstances, I would not refrain from consideration of the constitutional issue.
B.
Long-standing principles teach us to be reluctant to consider the constitutionality of a federal statute. See Zobrest v. Catalina School Dist., 509 U.S. 1, -, 113 S.Ct. 2462, 2465-66, 125 L.Ed.2d 1 (1993). It is well-settled that an act of Congress is to be presumed constitutional and that doubts about the construction of a federal statute are to be resolved, if fairly possible, in favor of its constitutionality. Id. With these principles of statutory construction in mind, I note that the district court concluded that Hamilton was entitled to equitable relief because defendants failed to satisfy their burden of demonstrating that their infringement upon Hamilton’s religious liberty was accomplished through the least restrictive means. Clearly, RFRA’s enactment was pivotal to the district court’s decision to enjoin enforcement of the hair length regulation. In fact, prior to the enactment of RFRA, our circuit had specifically held that a similar Missouri prison hair length restriction was valid as reasonably related to legitimate penological interests. Iron Eyes v. Henry, 907 F.2d 810, 813 (8th Cir.1990) (Iron Eyes), citing O’Lone v. Estate of Shabazz, 482 U.S. 342, 350, 107 S.Ct. 2400, 2405, 96 L.Ed.2d 282 (1987) (O’Lone), and Turner v. Safley, 482 U.S. 78, 89-91, 107 S.Ct. 2254, 2261-63, 96 L.Ed.2d 64 (1987) (Turner). Thus, the magistrate judge’s conclusion that RFRA effected a dramatic change in the legal landscape of Supreme Court and Eighth Circuit precedent was sine qua non to his recommendation *1560 that equitable relief be granted with regard to the hair length restriction.[1]
This conclusion deserves elaboration. Before I examine the limits of Congress’s power under § 5 of the Fourteenth Amendment, I find it helpful to review our court’s experience over the last two decades with the Free Exercise Clause and prison hair length restrictions. In my opinion, this background underscores the appropriateness of considering the constitutional question and facilitates an appreciation of the context in which that question arises.
In 1975, our court decided Teterud. The majority opinion describes Hamilton’s reliance on Teterud as “misplaced,” see note 11 supra, even though it involved a similar hair length issue and was decided before O’Lone. In Teterud, a Native American inmate challenged the constitutionality of a Missouri prison regulation which prohibited him from wearing long hair. Id. at 358. The district court applied the compelling interest test of Wisconsin v. Yoder, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972) (Yoder), and found that the regulation was an unconstitutional restriction on the inmate’s exercise of his Native American religion. Specifically, “[t]he district court found the wearing of long braided hair to be a tenet of the Indian religion sincerely held by [the inmate]. It further found that the interest of penal administration advanced by [the warden] could be served by viable, less restrictive means.” Teterud, 522 F.2d at 359. We held that neither of these findings was clearly erroneous. In response to the warden’s argument that, inter alia, long hair caused identification problems and presented the opportunity for contraband smuggling, we agreed with the district court’s finding that the warden’s justifications were either without substance or overly broad. Id. at 361.
The compelling interest test that we applied to invalidate the prison hair length restriction in Teterud, however, was not to survive the Supreme Court’s decisions in O’Lone and Turner. See Iron Eyes, 907 F.2d at 813 (recognizing that Teterud was limited to its facts and that the compelling interest test had been rejecting by the Supreme Court when evaluating free exercise challenges to prison regulations).
Turner involved a Missouri prison regulation relating to inmate marriages and inmate-to-inmate correspondence. 482 U.S. at 81, 107 S.Ct. at 2257-58. The district court held that regulations allowing inmate marriage only with the warden’s permission when compelling reasons were present, and limiting inmate-to-inmate correspondence between unrelated inmates on nonlegal matters, were unconstitutional. We affirmed and applied strict scrutiny to conclude that the two regulations were not the least restrictive means of achieving the asserted goals of rehabilitation and security. Id. at 83, 107 S.Ct. at 2258-59. The Supreme Court reversed, holding that we improperly applied the heightened standard of Procunier v. Martinez, 416 U.S. 396, 413-14, 94 S.Ct. 1800, 1811-12, 40 L.Ed.2d 224 (1974), and that, instead, we should have determined whether the prison regulation which burdened a fundamental right was reasonably related to a legitimate penological interest. Turner, 482 U.S. at 87, 107 S.Ct. at 2260-61. Specifically, the Court set out a four-part test under which to analyze the challenged prison regulation. Id. at 89-90, 107 S.Ct. at 2261-62. Applying this test, the Court upheld the correspondence regulation but invalidated the marriage restriction. Id. at 100, 107 S.Ct. at 2267.
O’Lone was decided shortly after Turner. O’Lone involved an inmate’s challenge to several prison regulations which prevented Muslim inmates from attending Jumu’ah, a weekly congregational service commanded by the Koran. The Court reversed because it concluded that the court of appeals had improperly imposed a separate burden on prison officials to prove that no reasonable method existed by which prisoners’ religious rights can be accommodated without creating bona fide security risks. Id. at 350, 107 S.Ct. at 2405. The Court again reiterated the stan *1561 dard that had recently been stated in Turner and stressed that this “reasonableness” test, which was less restrictive than that applied to alleged infringements of fundamental constitutional rights outside the prison context, “avoid[ed] unnecessary intrusion of the judiciary into problems particularly ill-suited to resolution by decree.” Id. at 349-50, 107 S.Ct. at 2405 (quotation marks and citations omitted).
In the wake of these two Supreme Court decisions, we again faced an inmate’s free exercise challenge to a prison hair length restriction in Iron Eyes. The plaintiff, a Sioux Indian, relied on Teterud as support for his free exercise claim. We noted, however, the effect of O’Lone and Turner on the legal landscape of inmate challenges to prison regulations allegedly infringing upon fundamental rights, applied the less onerous reasonableness test, and held that the neutral grooming regulation was rationally related to prison security interests and therefore did not unreasonably infringe upon the inmate’s fundamental right to freely exercise his religion.[2] 907 F.2d at 816.
This review of our caselaw makes clear that, but for the passage of RFRA, Hamilton could not have succeeded on his free exercise challenge to the prison hair length regulation. Hamilton argues that, because RFRA restored the compelling interest test of Yoder, the controlling Eighth Circuit case on prison hair length regulation is once again Teterud.[3] The magistrate judge, through his analysis, implicitly accepted this argument, as do I.[4] Consequently, I believe that we are squarely faced with the question whether Congress had the power to enact RFRA and thereby supplant the Supreme Court’s prior free exercise decisions, including O’Lone and Turner, and our own circuit precedent.[5]
C.
Defendants argue that RFRA is unconstitutional because Congress lacks authority under § 5 of the Fourteenth Amendment to interfere with the state’s operation of its *1562 prisons. They contend that the Supreme Court has defined what rights inmates have pursuant to the Free Exercise Clause by applying the reasonableness test set forth in O’Lone and Turner. They maintain that RFRA establishes a different test applicable to prisons, and therefore, creates religious rights for prisoners that otherwise would not exist. Defendants argue that § 5 does not give Congress the power to change the constitutional holdings in O’Lone and Turner. They maintain that the only basis for affirming the judgment, in light of prior precedent, is the change made by Congress in RFRA and that RFRA is an unconstitutional extension of congressional power. Defendants conclude that § 5 is not an available basis for the enactment of RFRA because it is merely an “enforcement” provision which is limited to providing remediation consistent with the goals of the Fourteenth Amendment. They therefore reason that RFRA cannot be said to be “enforcing” a religious exercise right when the Supreme Court had held that there was no such right.
Hamilton, and the government, on the other hand, maintain that RFRA’s enactment represents a valid exercise of congressional authority under § 5. They argue that, because the Due Process Clause of the Fourteenth Amendment incorporates the First Amendment, nothing in § 5 limits Congress’s ability to legislate the procedures to be used to vindicate free exercise claims. The government contends that Congress’s § 5 power extends beyond the authority merely to prohibit specific constitutional violations by the states and that § 5 empowers Congress to legislate prophylaetically by proscribing or regulating conduct that, although not unconstitutional, threatens or infringes upon the exercise of Fourteenth Amendment rights. Both Hamilton and the government contend that numerous Supreme Court decisions support their broad interpretation of Congress’s power under § 5.[6] Further, the government argues that RFRA not only, promotes the Fourteenth Amendment’s free exercise guarantee, but also enforces the Equal Protection Clause by protecting against religious discrimination. The government states emphatically that RFRA creates a statutory, not constitutional, free exercise right. The government admits that the separation of powers doctrine protects the specific constitutional judgments of the federal courts from legislative interference, and recognizes the Supreme Court’s paramount authority to interpret the Constitution; the government asserts, however, that RFRA is simply a statute that provides legislative protection for a constitutional right over and above that provided by the Constitution.
D.
As noted in the majority opinion, supra note 7, RFRA was passed in response to the Supreme Court’s decision in Employment Division v. Smith, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (Smith). In Smith, two members of the Native American Church claimed that the state unfairly denied them unemployment compensation because their religious use of peyote, which resulted in their job termination, was determined to be disqualifying “misconduct.” Id. at 876, 110 S.Ct. at 1599. After remand to the Oregon Supreme Court for a determination as to the legality of peyote use,[7] the Supreme Court held that the Free Exercise Clause permitted Oregon to prohibit sacramental peyote use and therefore to deny the payment of unemployment benefits to the Native Americans discharged for using peyote. Id. at 890, 110 S.Ct. at 1606. In so holding, the *1563 Court rejected the application of the compelling interest test to free exercise claims which challenged neutral and valid laws of general applicability. Id. at 885, 110 S.Ct. at 1603. All parties in the present case agree that we should not, and indeed could not, decide whether the decision of the Court in Smith was correct as a matter of constitutional law. Rather, our analysis should focus on whether § 5 of the Fourteenth Amendment provides a basis for Congress’s enactment of RFRA.[8] For the reasons stated below, I would hold that it does not.
“The powers of the legislature are defined and limited; and that those limits may not be mistaken or forgotten, the constitution is written.” Marbury v. Madison, 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803) (Marbury ). While the Constitution was carefully drafted to protect the states from undue intrusion by the federal government, the Supreme Court has recently reminded us that “[t]he Civil War Amendments ... worked a dramatic change in the balance between congressional and state power over matters of race.” City of Richmond v. J.A. Croson Co., 488 U.S. 469, 490, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1989); see Oregon v. Mitchell, 400 U.S. 112, 129, 91 S.Ct. 260, 267, 27 L.Ed.2d 272 (1970) (Mitchell) (Black, J.). The most legally far-reaching of these Amendments, the Fourteenth, provides the fundamental principles of equal protection and due process of law. Although this Amendment was enacted in response to our country’s shameful history of slavery and racial discrimination, many of the protections set forth in the Bill of Rights have been applied to the states through the Due Process Clause of the Fourteenth Amendment, including the protections of the First Amendment. See Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940) (“The fundamental concept of liberty embodied in that Amendment embraces the liberties guaranteed by the First Amendment.”). Section 5 of the Fourteenth Amendment states that “[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article.” U.S. CONST. amend. XIV, § 5. Because it is “emphatically the province and duty of the judicial department to say what the law is,” Marbury, 5 U.S. at 177, we should determine whether RFRA falls within the scope of legislative power granted to Congress by § 5, as it has been interpreted by the courts.
The issue of whether Congress’s power under § 5 of the Fourteenth Amendment is the same when it acts to enforce an incorporated right as when it acts to remedy or to prevent a violation of the Fourteenth Amendment itself has not been expressly decided. See Hutto v. Finney, 437 U.S. 678, 718, 98 S.Ct. 2565, 2587-88, 57 L.Ed.2d 522 (1978) (Rehnquist, J., dissenting). An argument could be made, based on both historical perspective and the logic of the doctrine of incorporation itself, that Congress’s power to enforce incorporated rights under § 5 should be circumscribed. See Mitchell, 400 U.S. at 129, 91 S.Ct. at 267 (‘Where Congress attempts to remedy racial discrimination under its enforcement powers, its authority is enhanced by the avowed intention of the framers of the Thirteenth, Fourteenth, and Fifteenth Amendments.”). The Supreme Court has not had an occasion to resolve this issue. Nor would it be necessary, in my opinion, for this panel decide this particular issue in the present ease because I believe that RFRA is unconstitutional, even assuming Congress’s powers under § 5 are not variable.
The leading case on the scope of Congress’s power under § 5 is Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) {Morgan). In Morgan, the Supreme Court referred to § 5 as “a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Four *1564 teenth Amendment.” Id. at 651, 86 S.Ct. at 1723-24. That ease considered whether § 4(e) of the Voting Rights Act of 1965, 42 U.S.C. § 1973b(e), was “appropriate legislation” to enforce the Equal Protection Clause. In respects pertinent to the cases under review in Morgan, § 4(e) provides that no person who has successfully completed the sixth grade in a public school in, or a private school accredited by, the Commonwealth of Puerto Rico in which the language of instruction was other than English shall be denied the right to vote in any election because of his or her inability to read or write English. The State of New York challenged the statute because it conflicted with the state’s requirement that voters be able to read and write English. Morgan, 384 U.S. at 643-45, 86 S.Ct. at 1719-21. The Court, however, held that section 4(e) was “a proper exercise of the powers granted to Congress by § 5 of the Fourteenth Amendment.” Id. at 646, 86 S.Ct. at 1721.
New York argued that an exercise of congressional power under § 5 could only be sustained if the state law which was invalidated by the legislative action was itself vio-lative of the Fourteenth Amendment. The Court disagreed and held that “[a] construction of § 5 that would require a judicial determination that the enforcement of the state law precluded by Congress violated that Amendment, as a condition of sustaining the congressional enactment, would depreciate both congressional resourcefulness and congressional responsibility for implementing the Amendment.” Id. at 648, 86 S.Ct. at 1722. In its discussion of the scope of § 5, the Court explained that “the draftsmen sought to grant to Congress, by a specific provision applicable to the Fourteenth Amendment, the same broad powers expressed in the Necessary and Proper Clause.” Id. at 650, 86 S.Ct. at 1722; see Ex parte Virginia, 100 U.S. 339, 345-46, 25 L.Ed. 676 (1879) (delineating the scope of § 5 powers); see also South Carolina v. Katzenbach, 383 U.S. 301, 326, 86 S.Ct. 803, 817-18, 15 L.Ed.2d 769 (1966) (Katzenbach) (applying the McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), standard to the enforcement provision of the Fifteenth Amendment).
Analyzing § 4(e) under this broad standard, the Court provided two alternative bases for its conclusion that § 4(e) was a proper exercise of § 5 power. These two bases have been referred to by the commentators as the remedial theory and the substantive theory of § 5 power.[9] The Court first considered a remedial justification for the enactment of § 4(e). Explaining the enactment of § 4(e) as a measure to enforce the Equal Protection Clause, the Court stated in Morgan: “Section 4(e) may be viewed as a measure to secure for the Puerto Rican community residing in New York nondiscriminatory treatr ment by government — both in the imposition of voting qualifications and the provision or administration of governmental services.... ” Morgan, 384 U.S. at 652, 86 S.Ct. at 1724. The Court further provided that the statute was plainly adapted to furthering the aims of the Equal Protection Clause because it “enable[d] the Puerto Rican minority of New York better to obtain perfect equality of civil rights and the equal protection of the laws.” Id. at 653, 86 S.Ct. at 1724 (quotation marks omitted). The Court concluded that, where Congress has assessed and weighed the various conflicting considerations, the statute would be upheld as long as a basis could be perceived upon which Congress might have resolved the conflicting considerations as it did. Id.
This conclusion, based on a remedial approach, in no way rested on the possibility that Congress determined the enactment or application of the state’s English literacy requirement had as its purpose the perpetua *1565 tion of invidious discrimination. As Justice Stewart understood the first Morgan rationale, Congress could have concluded that “enhancing the political power of the Puerto Rican community by conferring the right to vote was an appropriate means of remedying discriminatory treatment in public services.” Mitchell, 400 U.S. at 295, 91 S.Ct. at 350 (Stewart, J., concurring in part and dissenting in part). In other words, the Morgan Court concluded that, by ensuring that the Puerto Rican community was not denied that right which is “preservative of all rights,” Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 1071, 30 L.Ed. 220 (1886), Congress rationally enacted § 4(e) to “enforce and effectuate the judicially determined constitutional prohibition on racial discrimination by government.” Daniel O. Conkle, The Religious Freedom Restoration Act: The Constitution Significance of an Unconstitutional Statute, 56 Mont.L.Rev. 39, 47 (1995); see Fullilove v. Klutznick, 448 U.S. 448, 477, 100 S.Ct. 2758, 2774, 65 L.Ed.2d 902 (1980) (plurality opinion).
The Court then provided a second basis for Congress’s enactment of § 4(e) which it believed would also make § 4(e) “appropriate legislation” under § 5. This was the so-called substantive theory.[10] The Court prefaced this portion of its analysis as follows: “The result is no different if we confine our inquiry to the question whether § 4(e) was merely legislation aimed at the elimination of an invidious discrimination in establishing voter qualifications.” Id. at 653-54, 86 S.Ct. at 1725. In this section, the Court reviewed the factual determination which Congress may have made regarding the particular purpose behind the New York’s English literacy law. The Court noted that Congress might have questioned both the role that prejudice played in the passage of the state law and further questioned the public policy concerns and the way in which the state legislature resolved them. Clearly, this type of review is within the ambit of Congress’s “specially informed legislative competence.” Id. at 656, 86 S.Ct. at 1725. Thus, the Court concluded that
it is enough that we perceive a basis upon which Congress might predicate a judgment that the application of New York’s English literacy requirement to deny the right to vote to a person with a sixth grade education in Puerto Rican schools in which the language of instruction was other than English constituted an invidious discrimination in violation of the Equal Protection Clause.
Id. In other words, Congress could look to the legislative intent behind the state law,[11] the substance of the state law, and the competing policy considerations, and form the belief that the application of the law was indeed an invidious discrimination which would violate the Equal Protection Clause, as that clause had been expounded by the Court. Furthermore, so long as the Court could perceive a basis for this legislative judgment, the exercise of § 5 power would be valid.
When Congress acts to invalidate a law that is neutral on its face but unconstitutionally discriminatory in application or intent,[12] it necessarily employs its superior factfinding capabilities and policymaking acumen to eradicate the effects of discrimination and prevent future constitutional violations which a federal court, because of its Article III limitations, for example, may not be able to address readily. I therefore think that the second Morgan theory is best understood to allow Congress to address those facially neu *1566 tral activities which may have unconstitutional underpinnings, and not as a rationale that grants Congress a substantive power under § 5 to define the scope of constitutional guarantees. With this understanding of Morgan’s alternative rationales, I proceed to consider whether § 5 can provide a basis for Congress’s enactment of RFRA.
E.
I begin my analysis of RFRA with the congressional findings, 42 U.S.C. § 2000bb(a), to highlight the diametrically opposed positions of the Supreme Court and Congress on the nature of the Free Exercise Clause and to demonstrate the a priori quality of these congressional findings. In short, the language of these findings portrays Congress, not as a political organ well-suited to conduct the business of empirical research and policy implementation, but as a super-Supreme Court.[13] Finding (2) which states that “laws neutral toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise” is clearly not the product of extensive factfind-ing but the result of a logician’s exercise. Id. § 2000bb(a)(2). Finding (3) further states that “governments should not substantially burden religious exercise without compelling justification.” Id. § 2000bb(a)(3). As the stated purposes of RFRA reveal, this finding is nothing more than the Congress’s adoption of the standard set forth in the pre-Smith Supreme Court decisions in Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (Sherbert), and Yoder, which the Supreme Court has specifically rejected as unworkable and unnecessary in free exercise eases.[14] See Smith, 494 U.S. at 888-90, 110 S.Ct. at 1605-06. Nevertheless, Congress provided in its final stated finding that “the compelling interest test as set forth in prior Federal court rulings is a workable test for striking sensible balances between religious liberty and competing prior governmental interests.” 42 U.S.C. § 2000bb(a)(5). In essence, Congress has instructed the Supreme Court how to interpret the Free Exercise Clause of the First Amendment (that is, apply the compelling interest test), even though the Court, the entity charged by the Constitution with its application, has determined that the compelling interest test is neither feasible nor required. It hardly needs to be said that where Congress and the Supreme Court are so clearly at odds with each other over the definition of a fundamental right, the conflict presents an obvious and serious threat to the delicate balance of the separation of powers.
In his opinion for the Court in Smith, Justice Scalia explained the problematic aspects of the compelling interest test in the context of free exercise cases:
The government’s ability to enforce generally applicable prohibitions of socially harmful conduct, like its ability to carry out other aspects of public policy, cannot depend on measuring the effects of a government action on a religious objector’s spiritual development. To make an individual’s obligation to obey such a law contingent upon the law’s coincidence with his religious beliefs, except where the State’s interest is “compelling” — permitting him, by virtue of his beliefs, to become a law unto himself, contradicts both constitutional tradition and common sense.
494 U.S. at 885, 110 S.Ct. at 1603 (internal citations and quotation marks omitted). The Court could not have been clearer in its expression of the view that the compelling interest test of Yoder and Sherbert should be abandoned as inconsistent with its constitutional judgment. Yet, through RFRA, Congress expressly intended “to restore the compelling interest test as set forth in [Sherbert ] and [Yoder] and to guarantee its application in all cases where free exercise of religion is *1567 substantially burdened.” 42 U.S.C. § 2000bb(b)(l).
Moreover, in direct contravention of the Court’s analysis in Smith, the “substantially burdened” element of RFRA requires courts to weigh the centrality of an adherent’s religious practice. Further exposing the failings of the compelling interest test in free exercise cases, Justice Scalia wrote: “Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.” Smith, 494 U.S. at 887, 110 S.Ct. at 1604. Yet, by injecting the “substantially burdened” element into a court’s RFRA analysis, Congress would require courts to weigh the extent of an alleged infringement upon a religious practice against the importance of that practice.[15] In fact, predictably, defendants in the present case have argued that RFRA does not apply to the challenged prison prohibitions because they merely “impinged” rather than “substantially burdened” Hamilton’s free exercise of religion. Brief for Appellants at 16. This type of argument is exactly what troubled the Court when it explained its inability to constitutionally apply the compelling interest test to free exercise claims challenging generally applicable laws. See Smith, 494 U.S. at 888-89, 110 S.Ct. at 1605-06.
Justice Scalia further explained the distinction between the application of the compelling interest test in eases of race discrimination, or the content regulation of speech, and matters of free exercise of religion: “What it produces in those other fields— equality of treatment and an unrestricted flow of contending speech — are constitutional norms; what it would produce here — a private right to ignore generally applicable laws — is a constitutional anomaly.” Id. at 886, 110 S.Ct. at 1604. I believe that this observation sheds considerable light upon the contours of § 5 as discussed in Morgan and the validity of RFRA.
In Morgan, § 5 was held to be a valid constitutional basis for a provision of the Voting Rights Act prohibiting the use of English literacy tests as a prerequisite to suffrage. In that instance, the use of § 5 as a means of furthering the cause of equal protection was certain. Congress did not impose a standard of review for all equal protection claims which the courts were to employ generally; rather, under the remedial or first Morgan theory, Congress prohibited a particular state practice in order to root out the effects of past invidious discrimination and to reduce the possibility of future invidious discrimination. Enacting such a law is, however, qualitatively different from imposing upon the Court a standard of review for free exercise claims which overrules its prior free exercise holdings. RFRA’s imposition of the compelling interest test on all free exercise claims is nothing less than a radical alteration of the Supreme Court’s free exercise jurisprudence.
Under the so-called substantive or second Morgan theory, the Court concluded that Congress, after conducting its own investigation, might have rationally determined that a facially valid state law was enacted or applied so as to invidiously discriminate in violation of the Equal Protection Clause. Again, in the present case, Congress did not, in an exercise of its superior factfinding capacity, take aim at a particular neutrally-phrased state law which it had concluded was enacted or applied unconstitutionally. In RFRA, Congress sought to impose a heightened level of scrutiny on the federal courts for every type of case in which state or federal government substantially burdens one’s religious practice. As such, Congress abdicated its responsibility to investigate the particular state action which might have the potential of unconstitutionally burdening the free exercise of religion, and instead, Congress has required the courts to investigate, under a standard previously rejected by the Supreme Court, the myriad cases in which plaintiffs claim their religious practice has been substantially and unjustifiably burdened. It is thus clear that the substantive or second Morgan rationale as well fails to support *1568 Congress’s “restoration” of the compelling interest test to all free exercise claims brought in federal court.
I believe that what Congress has done through RFRA’s passage under the banner of § 5 is dramatically different from its exercise of § 5 power in Morgan or in any other case to date. In Smith, the Supreme Court, consistent with its constitutional duty under Marburg, concluded that the scope of the First Amendment guarantee of free exercise did not require the imposition of a heightened level of scrutiny on neutral laws of general applicability, even though such laws may burden religious practice. When the Court so held, it was performing it most essential and solemn function: it interpreted the scope of the Free Exercise Clause and determined that neutral laws of general applicability passed constitutional muster. In passing RFRA, the Congress did not invalidate a state law or state prison regulation as violative of, or even inconsistent with, the goals of the Fourteenth Amendment; rather, Congress substantively altered the Supreme Court’s understanding of what the Free Exercise Clause actually means.
Were we to uphold RFRA on the basis of § 5, we would, under our reading of Smith, allow Congress to impose a standard for the judicial evaluation of all free exercise claims which not only overrules prior free exercise decisions but also, in the considered and paramount judgment of the Supreme Court, leads to constitutionally anomalous results. Where, as here, Congress acts under the aegis of § 5 to impose on the judiciary a method of analysis for the resolution of all claims based on the fundamental right of free exercise, which in the Court’s view, does not produce “equality of treatment” but constitutional anomalies, such legislative action, I think, must be beyond the language and constitutional intent of § 5.[16] I believe that, through RFRA, Congress does not seek simply to enhance the protection afforded by the Free Exercise Clause, but to define it. I therefore conclude that RFRA is unconstitutional. Accord Flores v. City of Boerne, 877 F.Supp. 355, 356-57 (W.D.Tex.1995); In re Tessier, 190 B.R. 396 (Bankr.D.Mont.1995).
F.
I recognize that several district court decisions have upheld RFRA as constitutional. See, e.g., Sasnett v. Department of Corrections, 891 F.Supp. 1305, 1315-21 (W.D.Wis.1995) (Sasnett); Belgard v. Hawaii, 883 F.Supp. 510, 512-17 (D.Hawai'i 1995) (Belgard) (followed by Abordo v. Hawaii, 902 F.Supp. 1220, 1229-34 (D.Hawai'i 1995)). However, I disagree with the reasoning of those cases. In Belgard, much like the present case, the plaintiff was a Native American who challenged various prison regulations including a hair length restriction. 883 F.Supp. at 511. Hawaii argued that RFRA was unconstitutional because it represented “congressional usurpation of functions entrusted exclusively to the judiciary, including delineation of the boundaries of constitutional rights and calibration of the proper balance between competing interests of constitutional magnitude.” Id. at 513. Rejecting the state’s argument, the district court relied heavily on Morgan. Specifically, the district court made much of the fact that the Supreme Court declined to overrule Lassiter v. Northampton Elections Bd., 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959) (Lassiter), and, “despite the statute’s vitiation of Lassi-ter, sustained the constitutionality of section 4(e) of the Voting Rights Act.” Belgard, 883 F.Supp. at 514. The district court, seizing upon the substantive or second Morgan theory, stated that the Supreme Court’s alternate rationale for sustaining § 4(e) was “a legislative judgment that the literacy requirement *1569 violated the Equal Protection Clause per se.” Id. Because of this apparent direct conflict between Lassiter and § 4(e), the district court concluded that Congress had the power to “expressly disagree with the Court as to the reach of constitutional rights.” Id. (citation omitted).
I believe the district court in Belgard read the scope of the Morgan holding too broadly. To properly understand the limits of the substantive or second Morgan theory, I revisit Lassiter. In that case, the plaintiffs brought only a facial challenge to a North Carolina literacy requirement nearly identical to the New York requirement in Morgan. As noted in Belgard, the Court concluded that “ ‘literacy and illiteracy are neutral on race.’” Id. at 515 (quoting Lassiter, 360 U.S. at 51, 79 S.Ct. at 990). However, the Lassiter Court importantly noted: “Of course a literacy test, fair on its face, may be employed to perpetuate that discrimination which the Fifteenth Amendment was designed to uproot. No such influence is charged here.” 360 U.S. at 53, 79 S.Ct. at 991. The Lassiter holding did not preclude the possibility that a constitutional challenge to the application of the North Carolina literacy requirement might not be successful. See Katzenbach, 383 U.S. at 333, 86 S.Ct. at 821. This sheds considerable light on the substantive or second Morgan theory of § 5 power. The Supreme Court simply noted that, under § 5, Congress could examine the effect of, and the policy decisions behind, a literacy requirement and determine that “the application of New York’s literacy requirement” was invidious discrimination. Morgan, 384 U.S. at 656, 86 S.Ct. at 1726. Thus, Lassiter and Morgan were not constitutionally inconsistent.[17] The Morgan Court did not, by implication, provide that Congress could disagree with the Supreme Court’s constitutional judgment; rather, Morgan provided that Congress could determine that a literacy requirement, adjudged to be facially valid, may in application constitute invidious discrimination in violation of the Fourteenth Amendment’s Equal Protection Clause. Therefore, I believe the district court in Bel-gard was incorrect to conclude that “Morgan held that Congress acted within its enforcement authority under section 5 of the Fourteenth Amendment when, pursuant to section 4(e) of the Voting Rights Act, it limited prior Supreme Court doctrine in order to expand a right guaranteed by the Fourteenth Amendment.” Belgard, 883 F.Supp. at 516. By failing to appreciate the limits of Lassiter, the district court in Belgard implied that the Supreme Court’s decision in Morgan interpreted § 5 more broadly than it actually did.
I find Sasnett equally unavailing. Sasnett involved a challenge brought by a number of Wisconsin prison inmates against prison rules regulating the types of personal property they could possess. In holding RFRA constitutional, the district court in Sasnett also placed great reliance on Morgan. The court followed a line of reasoning similar to that of Belgard and concluded: “Lassiter was to the Voting Rights Act what Smith is to the Religious Freedom Restoration Act.” 891 F.Supp. at 1317. It should be clear from my analysis thus far that I believe the Bel-gard and Sasnett courts have read Lassiter too broadly and thereby perceived a false conflict between Lassiter and Morgan. Las-siter’s holding was clearly limited to the facial challenge to the North Carolina literacy requirement. In Morgan, the Comb simply determined that Congress’s judgment that the facially neutral literacy requirement was in application an example, of invidious discrimination violative of equal protection would not be upset as long as the Court could perceive a basis for this conclusion. A proper understanding of the precise interplay of these two Supreme Court decisions demonstrates the limits of Morgan. Morgan does not support the passage of RFRA as a valid exercise of § 5 power.
The Sasnett court also offered an alternative remedial justification for Congress’s use of § 5 power to enact RFRA. Under this approach, the district court concluded that “Congress has not attempted to define the *1570 First Amendment; rather, it has merely prohibited otherwise lawful activity as a means of further enforcing constitutional rights.” 891 F.Supp. at 1318. This is, in essence, the “statutory, not constitutional” right argument which the government advances in the present case. The Sasnett court found it “obvious that RFRA is a rational means of safeguarding the core constitutional right to free exercise, as judicially defined.” Id. Explaining Congress’s intent in passing RFRA, the district court continued: “Congress determined that requiring plaintiffs to prove that state actors intended to discriminate on the basis of religion creates an evidentiary barrier to the full protection of constitutional rights_ It was wholly rational for Congress to have concluded that [RFRA] would add greater protection to First Amendment guarantees.” Id. at 1319.
Again, I believe that the Sasnett court’s reliance on Morgan was misplaced. The Sasnett court concluded that the only way RFRA “substantively altered the scope of federal rights to free religious exercise was by obviating proof of discriminatory intent on the part of state actors.” Id. at 1319. However, I believe there is an important difference between a congressional enactment which invalidates a state law or practice in the absence of discriminatory intent, see Morgan, 384 U.S. at 652-53, 86 S.Ct. at 1724-25; see also City of Rome v. United States, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980), and a congressional enactment which summarily imposes an across-the-board standard for the evaluation of free exercise claims that the Supreme Court has criticized and abandoned. Through RFRA’s passage, Congress did not attempt to root out a particular evil, such as literacy tests, which were often means for perpetuating racial discrimination, but simply expressed the normative judgment that “governments should not substantially burden religious exercise without compelling justification.” 42 U.S.C. § 2000bb(a)(3). This is the role given to the Supreme Court, not Congress, by the Constitution.
RFRA is neither remedial nor supplemental, but definitional. Morgan upheld a law which, as the Court indicated, Congress might have rationally concluded would either remedy past invidious discrimination or prevent future discriminatory conduct. In RFRA, however, Congress establishes a rejected method of analysis for all free exercise claims simply because Congress interprets the Free Exercise Clause differently than the Supreme Court. This is not prophylaxis but unconstitutional interbraneh hegemony. As Justice Harlan stated in Mitchell, “[to] allow a simple majority of Congress to have final say on matters of constitutional interpretation is ... fundamentally out of keeping with the constitutional structure.” 400 U.S. at 205, 91 S.Ct. at 305 (Harlan, J., concurring in part and dissenting in part). Consequently, I would hold that the enactment of RFRA was not a valid exercise of § 5 power. To hold otherwise would be inconsistent with the essence of judicial review and the separation of powers. See Flores v. City of Boerne, 877 F.Supp. 355 (W.D.Tex.1995) (holding RFRA unconstitutional under the separation of powers doctrine). Section 5 grants Congress the power to supplement, not subvert, the Supreme Court’s underlying constitutional jurisprudence.
III.
Because Congress does not have the power under § 5 of the Fourteenth Amendment to enact RFRA, I would hold that the Religious Freedom Restoration Act is unconstitutional.[18] Accordingly, I would vacate the judgment of the district court and remand the case for further proceedings.

. While I am inclined to believe that the denial of Hamilton's request for a sweat lodge ceremony would also justify an examination of the constitutionality of RFRA, I will, for purposes of analysis, focus on the injunction prohibiting enforcement of the hair length restriction because RFRA’s effect on this claim is more easily discernible.

. We note that in Iron Eyes v. Henry, 907 F.2d 810 (8th Cir.1990) (Iron Eyes), the prison did provide a procedure through which an inmate could apply for an exemption from the prohibition against long hair. That exemption was eliminated after the appeal in Iron Eyes was taken under submission. Id. at 815 n. 7. However, in a subsequent decision, our court affirmed a district court’s decision to dismiss, on the basis of our holding in Iron Eyes, a complaint filed by an inmate who challenged the same hair length restriction at the same facility when the exemption no longer existed. Campbell v. Purkett, 957 F.2d 535 (8th Cir.1992) (per curiam); accord Bettis v. Délo, 14 F.3d 22 (8th Cir.1994) (upholding Missouri prison hair length regulation).

. In its report to the Congress on RFRA, the Senate Judiciary Committee explained: “As applied in the prison and jail context, the intent of the act is to restore the traditional protection afforded to prisoners to observe their religions which was weakened by the decision in O’Lone v. Estate of Shabazz." S.Rep. No. 111, 103d Cong., 1st Sess. 9 (1993), reprinted in 1993 U.S.C.C.A.N. 1892, 1899. The Committee also found that “the compelling interest standard established set forth [sic] in the Act will not place undue burdens on prison authorities." Id. at 11. Finally, the Committee concluded that no special exemption for prison free exercise claims under the Act was necessary. Id.

. The magistrate judge carefully considered the "restored” compelling interest test set out in RFRA. He first made a finding that Hamilton's beliefs were sincerely held, and then concluded the hair length regulation and the prohibition against sweat lodge ceremonies substantially burdened Hamilton’s exercise of his religion. While the magistrate judge recognized the compelling governmental interest in prison security, the magistrate judge determined that defendants had not satisfied their burden of demonstrating the hair length regulation was the least restrictive means of furthering that interest. The magistrate judge noted, in response to fears of contraband smuggling, that women incarcerated in Missouri correctional facilities were not required to keep short hair, and the magistrate judge also found significant the testimony of two male inmates who were photographed with long hair but not photographed again after their hair had been cut short. In Teterud v. Burns, 522 F.2d 357, 361 (8th Cir.1975), our court affirmed the district court’s rejection of similarly expressed concerns about contraband smuggling and inmate identification as inadequate justification for the hair length regulation.

.See Werner v. McCotter, 49 F.3d 1476, 1479 (10th Cir.) ("The recent passage of [RFRA] legislatively overturned a number of recent Supreme Court decisions, including Turner and [O'Lone ], by defining a statutory (if not constitutional) right to the free exercise of religion."), cert. denied, - U.S. -, 115 S.Ct. 2625, 132 L.Ed.2d 866 (1995).

. See City of Rome v. United States, 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) (holding § 5 of the Voting Rights Act of 1965 was a valid exercise of congressional power under § 2 of the Fifteenth Amendment); Oregon v. Mitchell, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970) (Mitchell) (holding inter alia that Congress could set the age requirement for national elections but not state or local elections); Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966) (Morgan) (holding § 4(e) of the Voting Rights Act was a valid exercise of Congress’s enforcement power under § 5 of the Fourteenth Amendment).

. The Oregon Supreme Court held that peyote use was proscribed by the state's drug laws; however, the court also concluded that this prohibition was invalid under the Free Exercise Clause. Employment Div. v. Smith, 494 U.S. 872, 875, 110 S.Ct. 1595, 1598, 108 L.Ed.2d 876 (1990).

. In a footnote to its brief, the government suggests that RFRA is also a valid exercise of congressional power under the Commerce Clause. Brief for Plaintiff-Intervenor at 33 n. 16. We note, however, that the only basis suggested in the legislative histoiy to RFRA, and in the main text of the government's brief, is § 5 of the Fourteenth Amendment. For many of the same structural reasons cited in this dissenting opinion, which preclude § 5 from supporting RFRA’s constitutionality, I cannot conclude, based on the very limited treatment of the issue by the government, that the Commerce Clause is a valid basis for the enactment of RFRA.

. See Daniel O. Conkle, The Religious Freedom Restoration Act: The Constitutional Significance of an Unconstitutional Statute, 56 Mont.L.Rev. 39 (1995). Explaining the alternative rationales of Morgan, Justice Stewart in Mitchell stated:
The Court's opinion made clear that Congress could impose on tire States a remedy for the denial of equal protection that elaborated upon dle direct command of the Constitution, and that it could override state laws on the ground that they were in fact used as instruments of invidious discrimination even though a court in an individual lawsuit might not have reached that factual conclusion.
400 U.S. at 296, 91 S.Ct. at 350 (Stewart, J., concurring in part and dissenting in part).

. While we employ this terminology occasionally throughout our opinion, we do not believe, as will be discussed later, that the second Morgan rationale for § 4(e)’s validity under § 5 is properly characterized as substantive.

. In Morgan, the Court took notice of the evidence of the discriminatory attitudes which likely influenced the enactment in 1916 of the New York English literacy requirement. 384 U.S. at 654 n. 14, 86 S.Ct. at 1725 n. 14.

.Seven years before Morgan, the Supreme Court upheld a facial challenge to a North Carolina law nearly identical to the New York law struck down by § 4(e) of the Voting Rights Act. See Lassiter v. Northampton Elections Bd., 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959). The Court was careful to note that the “issue of discrimination in the actual application of the ballot laws of North Carolina” had not been presented in the state court below, and would not therefore be reached. Id. at 50, 79 S.Ct. at 989.

. In fact, the Senate Judiciary Committee expressly stated that "the purpose of this act [was] only to overturn the Supreme Court's decision in Smith." S.Rep. No. 111, at 12 U.S.Code Cong. & Admin.News 1993 at 1902.

. See Scott C. Idleman, The Religious Freedom Restoration Act: Pushing the Limits of Legislative Power, 73 Tex.L.Rev. 247, 313 (1994) ("In the specific case of RFRA ... the relevance of Congress's factfinding capacity is not entirely obvious. For one thing, the rejection of judicial balancing in Employment Division v. Smith was arguably a normative, and not empirically contingent, judgment about the meaning of free exercise and the nature of the judiciary.”).

. See, e.g., Alameen v. Coughlin, 892 F.Supp. 440, 448 (E.D.N.Y.1995) ("[T]o impose a substantial burden, government interference must be more than an inconvenience. The interference must burden a belief central to a plaintiffs religious doctrine." (citation omitted)).

. See City of Richmond v. J.A. Croson Co., 488 U.S. 469, 490, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1989) ("The power to 'enforce' may at times also include the power to define situations which Congress determines threaten principles of equality and to adopt prophylactic rules to deal with those situations.”); see also Christopher V. Eisgruber & Lawrence G. Sager, Why the Religious Freedom Restoration Act is Unconstitutional, 69 N.Y.U.L.Rev. 437, 453-54 (1994) ("RFRA’s compelling state interest test privileges religious believers by giving them an ill-defined and potentially sweeping right to claim exemption from generally applicable laws, while comparably serious secular commitments — such as those flowing from parental obligation, philosophical conviction, or lifelong cultural practice — receive no such legal solicitude.’’).

. But see Note, When The Supreme Court Restricts Constitutional Rights, Can Congress Save Us? An Examination of Section 5 of the Fourteenth Amendment, 141 U.Pa.L.Rev. 1029, 1061 (1993) (concluding that the second Morgan theory “holds that Congress can expressly disagree with the Court as to the reach of constitutional rights”).

. Because I would hold that Congress was without power to enact RFRA under § 5 of the Fourteenth Amendment, I would not reach defendants' arguments that RFRA violates the Tenth Amendment and, as applied, violates the Establishment Clause.