**Gerald L. BELGARD, Plaintiff,**

**v.**

**STATE OF HAWAI'I, George Sumner, Director of Public Safety; John Smythe, Warden, Halawa Correctional Facility, and John Vaughn, Chaplain, Defendants.**

**Civ. No. 93–00961 HG.**

United States District Court,
D. Hawai'i.

May 1, 1995.

---

**1.** *See O'Connor v. Village Green Owners Assn.,* 33 Cal.3d 790, 795, 191 Cal.Rptr. 320, 662 P.2d 427 (1983).

Gerald L. Belgard, Aiea, HI, plaintiff pro se.

Robert A. Marks, Atty. Gen. of Hawaii, Thomas D. Farrell, Michael S. Vincent, Deputy Attys. Gen., Honolulu, HI, for defendants.

### AMENDED ORDER ADOPTING FINDINGS AND RECOMMENDATION OF THE MAGISTRATE IN PART

GILLMOR, District Judge.

Defendants the State of Hawaii, George Sumner, Director of Public Safety for the State of Hawaii, John Smythe, Warden of Halawa Correctional Facility (HCF), and John Vaughn, HCF Chaplain (collectively referred to herein as "Hawaii" or "Defendants"), object to Magistrate Judge Francis I. Yamashita's Findings and Recommendation filed herein on November 29, 1994. The Court adopts these Findings and Recommendation in part.

### I. BACKGROUND

Plaintiff Gerald Belgard, a full-blooded American Indian and inmate at HCF, contends that he is a follower and practitioner of a traditional Native American religion whose rituals entail use of medicine bags, eagle feathers, sweet grass and sage. Proceeding pro se on December 16, 1993, Belgard filed civil rights claims under 42 U.S.C. § 1983 against the Defendants alleging that they violated his First Amendment right to free exercise of religion under the United States Constitution by: (i) depriving him of religious items (viz., a medicine bag and eagle feathers) (count I); (ii) forcing him to cut his hair (count II); and (iii) denying him access to his religious counselor (count III). Plaintiff also requested a temporary restraining

order to enjoin such conduct by prison officials pursuant to Federal Rule of Civil Procedure 65(b).

On January 5, 1994, Magistrate Judge Francis I. Yamashita filed Findings and Recommendations (F & R I) recommending that the district court dismiss counts I and II. Magistrate Yamashita granted Belgard leave to proceed in forma pauperis as to count III.

On January 16, 1994, plaintiff filed objections to F & R I on the basis that Magistrate Yamashita ignored the newly-passed Religious Freedom Restoration Act of 1993, 42 U.S.C. §§ 2000bb, *et seq.* (RFRA). The RFRA "is of historical and legal significance because it reinstates the 'compelling state interest' standard to free exercise of religion claims previously eviscerated by the Supreme Court's decision in *Employment Division, Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872 [110 S.Ct. 1595, 108 L.Ed.2d 876] (1990)." *Campos v. Coughlin,* 854 F.Supp. 194, 204 (S.D.N.Y.1994). In an order filed March 3, 1994, federal district judge David A. Ezra declined to adopt F & R I and remanded for further evidentiary hearing "[i]n view of the heightened level of scrutiny afforded under the [RFRA]."

On November 29, 1994, Magistrate Yamashita issued a second Findings and Recommendation (F & R II). In F & R II, Magistrate Yamashita recommended that Belgard's motion for a temporary restraining order be denied because (i) Hawaii submitted a memorandum dated November 26, 1993 indicating that Belgard would be exempted from prison hair length regulations pending resolution of his legal claims; (ii) Belgard had been given access to religious counselors; and (iii) Defendants had replaced religious articles destroyed during Belgard's transfer to HCF and permitted him to use and store them in the inmate chapel. On this basis, Magistrate Yamashita found that "the threat of injury is not so immediate and irreparable as to require injunctive relief." F & R II at 6.

Magistrate Yamashita declined to consider a challenge to the constitutionality of RFRA raised in Hawaii's Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order. In doing so, Magistrate Yamashita noted that Hawaii's · extensive treatment of the constitutional issues was not a succinct response to the submissions requested by the magistrate judge from the parties. In view of the numerous filings and burdens imposed on his docket "[i]n this area", Magistrate Yamashita warned Hawaii that "sanctions could be imposed for improper submittals." F & R II at 4. Hawaii objects to this portion of F & R II.

## II. STANDARD OF REVIEW

Any party may object to a magistrate judge's findings and recommendation. 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.Proc. 72(b); Local Rule 404–2. A district court reviews the magistrate judge's findings and recommendations de novo and may accept, reject or modify the findings and recommendations in whole or in part. Local Rule 404–2.

## III. DISCUSSION

A. *The Constitutionality of the RFRA*

Hawaii objects to Magistrate Yamashita's "recommendation to revive" counts I and II, pertaining to hair length and religious articles respectively. They contend that:

> RFRA is unconstitutional, and accordingly, the original [sic] decision to dismiss for failure to state a claim is correct. If the only thing that has changed since the original decision is the injection of RFRA, defendants do not see how the Court can refuse to rule on defendant's claim that RFRA is unconstitutional. This Court should address the issue (particularly before trial, so that defendants can know what claims will be tried and what will be the applicable standard on which they must defend their policies).

Defendants' Objections to F & R II at 2.

Pursuant to F & R II, Magistrate Yamashita reversed his recommendation that counts I and II be dismissed as frivolous claims. Magistrate Yamashita specifically states that, "based on the application of heightened scrutiny, this Court finds that dismissal of Plaintiff's claims under 28 U.S.C. § 1915 is not appropriate at this time." F & R II at 4. Insofar as this reversal was plainly premised on the reinstatement of

strict scrutiny in the context of alleged restrictions on the free exercise of religion, Magistrate Yamashita necessarily assumed the constitutionality of the legislative act, the RFRA, reinstating this standard of review.

The Court is mindful that "[t]he general rule ... is to avoid constitutional issues unless essential to the decision of the case." *Gavin v. Peoples Natural Gas Co.*, 613 F.2d 482, 484 (3rd Cir.1980). However, because the constitutionality of the RFRA is dispositive as to whether counts I and II are to be dismissed as frivolous under 28 U.S.C. § 1915, the Court will address this issue of first impression.

In *Smith*, the Supreme Court considered "whether the Free Exercise Clause of the First Amendment permits the State of Oregon to include religiously inspired peyote use within the reach of its general criminal prohibition on use of that drug, and thus deny unemployment benefits to persons dismissed from their jobs because of such religiously inspired use." 494 U.S. at 874, 110 S.Ct. at 1597. In holding that Oregon drug laws were applicable to the smoking of peyote by adherents of Native American Church, the Court discarded the compelling governmental interest standard of scrutiny previously applied to generally applicable laws burdening the free exercise of certain religions. *See Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Thomas v. Review Bd. of Indiana Security Div.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Hobbie v. Unemployment Appeals Comm'n of Florida*, 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987). The *Smith* Court, lowering the degree of scrutiny afforded by the *Sherbert* test, held that "generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling governmental interest." 494 U.S. at 886, n. 3, 110 S.Ct. at 1604, n. 3.

The explicit, overriding purpose of the RFRA is "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where

free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1). The RFRA lauds the *Sherbert* test "for striking sensible balances between religious liberty and competing prior governmental interests," and disapproves *Smith* as a case that "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. §§ 2000bb(a)(3), (a)(5).

Hawaii argues that the RFRA is unconstitutional because it represents congressional usurpation of functions entrusted exclusively to the judiciary, including delineation of the boundaries of constitutional rights and calibration of the proper balance between competing interests of constitutional magnitude. Opposition Memorandum at 13–14, *citing Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803); *id.* at 17, *citing Katzenbach v. Morgan*, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). Hawaii argues that "[i]f the judicial branch finds that Congress has exceeded the extent of the power conferred by section 5 of the fourteenth amendment of the United States Constitution, it is the duty of the courts to declare RFRA unconstitutional." *Id.* at 14, *citing Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970). The Court finds that Congress, in enacting the RFRA, acted within its section 5 authority.

Central to this holding is the guidance given in *Morgan* as to the extent of Congress's power, pursuant to section 5 of the Fourteenth Amendment, to pass legislation protecting a constitutional right to a greater extent than the Supreme Court has interpreted the U.S. Constitution to require. Section 5 provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." In *Morgan*, the Court considered whether section 4(e) of the Voting Rights Act of 1965, prohibiting enforcement of a New York statute making literacy in English a voting prerequisite, was "appropriate legislation" under section 5 of the Fourteenth Amendment.

Katzenbach, the New York attorney general, argued that "§ 4(e) cannot be sustained as appropriate legislation to enforce the Equal Protection Clause unless the judiciary de-

cides—even with the guidance of a congressional judgment—that the application of the English literacy requirement prohibited by § 4(e) is forbidden by the Equal Protection Clause." *Morgan*, 384 U.S. at 648, 86 S.Ct. at 1722. The Court having upheld a similar North Carolina literacy requirement against a Fifth and Fourteenth amendment challenge in *Lassiter v. Northampton Election Bd.*, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072 (1959), Katzenbach argued that the judiciary had reached the opposite conclusion and that section 4(e) was therefore unconstitutional.

The *Morgan* Court disagreed. Significantly for present purposes, the Court declined to overrule *Lassiter* and, despite the statute's vitiation of *Lassiter*, sustained the constitutionality of section 4(e) of the Voting Rights Act. Justice Brennan, writing for the seven-justice majority, concluded that Congress could have found that section 4(e) was a remedial measure necessary to enforce the Equal Protection Clause, insofar as nullification of the English literacy requirement would lead to greater voting rights for Puerto Ricans in New York and in turn facilitate their attainment of other rights. The Court instructed:

> It is for Congress to assess and weigh the various conflicting considerations—the risk or pervasiveness of the discrimination in government services, the effectiveness of eliminating the state restriction on the right to vote as a means of dealing with the evil, the adequacy or availability of alternative remedies, and the nature and significance of the state interests that would be affected by the nullification of the English literacy requirement as applied to residents who have successfully completed the sixth grade in a Puerto Rican school.

*Id.* at 653, 86 S.Ct. at 1725.

More significantly for present purposes, the Court offered an alternative congressional rationale sufficient to sustain section 4(e)—a legislative judgment that the literacy requirement violated the Equal Protection Clause *per se*. *See* Paul Brest, *Congress as Constitutional Decisionmaker and Its Power to Counter Judicial Doctrine*, 21 Ga.L.Rev. 57, 71 (1986) (*"Countering the Court"*). In offering this second rationale, Justice Bren-

nan found a congressional "prerogative to weigh ... competing considerations" as part of an inquiry more constitutional than factual in nature. *Morgan*, 384 U.S. at 656, 86 S.Ct. at 1726. This inquiry asks whether "the application of New York's literacy requirement to deny the right to vote to a person with a sixth grade education in Puerto Rican schools in which the language of instruction was other than English constituted an invidious discrimination in violation of the Equal Protection Clause." *Id.*

■ As expressed by one commentator, "[t]his rationale—'the second *Morgan* rationale'—holds that Congress can expressly disagree with the Court as to the reach of constitutional rights." Matt Pawa, Note, *When the Supreme Court Restricts Constitutional Rights, Can Congress Save Us? An Examination of Section 5 of the Fourteenth Amendment*, 141 U.Penn.L.Rev. 1029, 1061 (1993) (*"Can Congress Save Us?"*). Similarly, where, as here, Congress expressly disagrees with the Supreme Court's departure from a level of scrutiny afforded restrictions on certain constitutional rights, "it is enough that we perceive a basis upon which Congress might predicate [such] a judgment...." *Morgan*, 384 U.S. at 656, 86 S.Ct. at 1726. *But see* Brest, *Countering the Constitution*, 21 Ga.L.Rev. at 104.

Hawaii attempts to distinguish the interplay of section 4(e) of the Voting Rights Act and the RFRA with the Supreme Court precedents respectively limited by them in the following manner:

> What distinguishes RFRA from the Voting Rights Act is that the Supreme Court had already acted [in *Smith* by reinstating the compelling governmental interest test]. In *Morgan*, the court had not yet considered whether English literacy requirements violated the equal protection clause. Justice Brennan's opinion [in *Morgan*] finds that, where the court has not acted, Congress may determine the issue and may enact remedial legislation. ... RFRA is not aimed at providing the answer to a previously unanswered constitutional question; it is aimed [at] providing a different answer than the one already provided by the Supreme Court in *Smith*.

Opposition Memorandum at 14–15 (footnote omitted).

This distinction is not persuasive. When Congress enacted section 4(e) of the Voting Rights Act, it did not legislate on a clean slate unmarked by contrary Supreme Court doctrine. The Supreme Court in *Lassiter* directly addressed and upheld the constitutionality of an English literacy requirement under the Equal Protection Clause, finding that "literacy and illiteracy are neutral on race...." 360 U.S. at 51, 79 S.Ct. at 990. Accordingly, when Congress passed section 4(e), the Supreme Court had already acted.

Equally unavailing is Hawaii's argument that the restriction on English literacy requirements in section 4(e) did not conflict with Supreme Court authority because the statute essentially codified, or at least coincided with, decisions handed down in the interim between the Voting Rights Act and *Lassiter*. *See* Opposition Memorandum at 16–17, *citing Oregon v. Mitchell*, 400 U.S. 112, 232–33, 91 S.Ct. 260, 318–19, 27 L.Ed.2d 272 (1970) (Brennan, J., dissenting) (canvassing post-*Lassiter* cases upholding "selective proscription" of literacy tests by Congress). As a preliminary matter, this argument is at odds with Hawaii's foregoing position that, prior to the enactment of section 4(e), the Supreme Court had not yet acted in the same constitutional arena.

Secondly, this argument is inconsistent with the *Morgan* Court's unanimous view of the import, if not the merits, of its holding. Even the dissent in *Morgan* and commentators critical of congressional limitations on judicial doctrine agree that in *Morgan,* the Supreme Court upheld section 4(e) notwithstanding its conflict with *Lassiter. See Morgan,* 384 U.S. at 661, 86 S.Ct. at 1733 (Harlan, J., dissenting) ("[i]n *Lassiter* ... this Court dealt with substantially the same question and resolved it unanimously in favor of the legitimacy of a state literacy qualification"); *id.* at 668, 86 S.Ct. at 1736 ("I do not think that it is open to Congress to limit the effect of [*Lassiter*] as it has undertaken to do by § 4(e)"); Brest, *Countering the Court,* 21 Ga.L.Rev. at 73 ("a statute that contradicts a judicial doctrine—as section 4(e) contradicts *Lassiter*—may be premised on dif-ferent assessments of competing values than those made by the Court").

Defendants are correct that the factual circumstances in *Lassiter* and *Morgan* are distinguishable, as recognized by the majority and Justice Harlan: whereas *Lassiter* involved a North Carolina literacy requirement directed at illiterate persons in a state that then had no significant non-English-speaking minorities, *Morgan* addressed a similar requirement targeting persons illiterate in English in the more polyglot context of New York. *See Morgan,* 384 U.S. at 662, 86 S.Ct. at 1733 (Harlan, J., dissenting). But the more essential point remains that *Morgan* gave Congress wide latitude to interpret the Constitution and expand a fundamental right pursuant to section 5 of the Fourteenth Amendment in an area where the Supreme Court had already spoken and afforded that right a narrower scope.

It might further be objected that Congress's enforcement power under section 5 of the Fourteenth Amendment is more limited in the context of an incorporated right, such as the free exercise of religion at issue here, than as to rights contained "*in haec verba* in the language of the Fourteenth Amendment itself." *Hutto v. Finney,* 437 U.S. 678, 717, 98 S.Ct. 2565, 2587, 57 L.Ed.2d 522 (1978) (Rehnquist, J., dissenting). *Morgan* involved congressional enforcement pursuant to section 5 of a right expressly inscribed in and guaranteed by the Fourteenth Amendment, "the right to vote." In the context at hand of a State's encroachment on a First Amendment right, it could be argued that Congress's section 5 enforcement power is not of the same caliber. The Court recognizes this potential objection but finds insufficient authority for the proposition that this distinction bears on Congress's power to limit or contradict judicial doctrine by statute pursuant to section 5, given that Congress's authority to enforce incorporated rights under section 5 is well-established. *See, e.g., Hutto,* 437 U.S. at 685, 98 S.Ct. at 2570 *et seq.* (upholding congressional authorization of attorney's fees in civil rights suits brought against states to enforce right to freedom from cruel and unusual punishment under the Eighth Amendment); *Church of the Lu-*

kumi Babalu Aye v. City of Hialeah, ——
U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472
(1993) (sustaining challenge brought by peti-
tioner-church under section 1983 to city ordi-
nances prohibiting animal sacrifice and
thereby burdening the exercise of its religion
under the Free Exercise Clause of the First
Amendment); *Pawa, Can Congress Save
Us?*, 141 U.Penn.L.Rev. at 1096.

The basis on which Congress predicated
the RFRA is plain. Congress was expressly
concerned that "[b]y lowering the level of
constitutional protection for religious prac-
tices, [*Smith*] has created a climate in which
the free exercise of religion is jeopardized."
S.Rep. No. 103–111, 103d Cong., 2d Sess. 8
(1993), U.S. *citing Yang v. Sturner*, 750
F.Supp. 558 (D.R.I.1990) (reversing pre-
*Smith* decision upholding Hmong religious
objection to autopsy); *State v. Hershberger*,
462 N.W.2d 393 (Minn.1990) (abandoning on
remand reliance on U.S. Constitution to pro-
tect Amish's free exercise right not to put
fluorescent emblems on their horsedrawn
buggies in light of *Smith*). The Senate Re-
port clarifies that "[t]his bill is not a codifica-
tion of the result reached in any prior free
exercise decision but rather the restoration
of the legal standard that was applied in
those decisions." *Id.* at 9.

In the context of prisoners' free exercise of
religion, the Senate Report specifies that
"[t]he act would return to a standard that
was employed without hardship to the pris-

ons in several circuits prior to the *O'Lone* [v.
*Estate of Shabazz*, 482 U.S. 342, 107 S.Ct.
2400, 96 L.Ed.2d 282 (1987)] decision." *Id.*
In light of this legislative history, this Court
concludes that while the RFRA no doubt
"changes the law," *see Robertson v. Seattle
Audubon Society*, 503 U.S. 429, ——, 112
S.Ct. 1407, 1413, 118 L.Ed.2d 73 (1992) (con-
cluding that § 318(b)(6)(A) of the Northwest
Timber Compromise "compelled changes in
law, not findings or results under old law"),
the RFRA does not purport to "prescribe a
rule for the decision of a case in a particular
way" so as to undermine its constitutionality
on separation of powers grounds. *United
States v. Klein*, 80 U.S. (13 Wall.) 128, 146, 20
L.Ed. 519 (1871); Pawa, *Can Congress Save
Us?*, 141 U.Penn.L.Rev. at 1099.

*Morgan* held that Congress acted within
its enforcement authority under section 5 of
the Fourteenth Amendment when, pursuant
to section 4(e) of the Voting Rights Act, it
limited prior Supreme Court doctrine in or-
der to expand a right guaranteed by the
Fourteenth Amendment. Here, the basis for
Congress's limitation on—or restoration of—
judicial doctrine is plainer and, absent a par-
ticularized demonstration to the contrary as
to a specific application not before this Court,
no less sound.[1] Accordingly, the Court finds
that Congress was equally within the bounds
of its enforcement powers under the Four-
teenth Amendment when it enacted the
RFRA to restore the pre-*Smith* boundaries

---

1. Defendants, further attempting to distinguish
*Morgan*, assert that "Congress may increase the
scope of civil liberty, as it did with the Voting
Rights Act, because none of the new liberty creat-
ed in that act was created at someone else's
expense. That is not true of RFRA." Opposition
Memorandum at 18. *See Morgan*, 384 U.S. at
651, n. 10, 86 S.Ct. at 1724, n. 10 ("Congress'
power under § 5 grants Congress no power to
restrict, abrogate, or dilute those guarantees").
Defendants argue that the RFRA falls afoul of
Congress's section 5 authority insofar as it alters
the balance between groups asserting their free
exercise right and potentially competing groups
invoking rights entitled to less than strict scruti-
ny. To illustrate this danger, defendants offer a
hypothetical example wherein a landlord invokes
the RFRA to shield from a city ordinance his
discriminatory housing decisions made pursuant
to sincerely held religious beliefs.

However, a recent case involving a similar
scenario belies defendants' contention that the
RFRA, by reinstating the *Sherbert* compelling in-
terest test, disenfranchises groups asserting less
privileged rights and debilitates the courts as
guarantors of such rights. In *Swanner v. An-
chorage Equal Rights Comm.*, 874 P.2d 274 (Alas-
ka) (per curiam), *cert. denied*, —— U.S. ——, 115
S.Ct. 460, 130 L.Ed.2d 368 (1994), the petitioner-
landlord argued that he was exempt from local
and state ordinances prohibiting marital status
discrimination because, under the RFRA, these
ordinances unduly burdened the exercise of his
religious belief that cohabitation is a sin. The
Alaska Supreme Court held that the RFRA did
not render these ordinances unenforceable as to
Swanner, given the state's compelling interest in
preventing marital status discrimination in hous-
ing decisions.

of the freedom of free exercise of religion under the First Amendment.[2]

## B. *Injunctive Relief*

██ Under Fed.R.Civ.Proc. 65(b), a temporary restraining order may not be granted absent specific facts showing that an "immediate and irreparable injury" will otherwise result. *Sampson v. Murray,* 415 U.S. 61, 67, 94 S.Ct. 937, 941, 39 L.Ed.2d 166 (1974). Magistrate Yamashita found that Belgard faces no imminent irreparable harm warranting injunctive relief on the basis of evidence that: (i) as to count I, Defendants have exempted Belgard from hair length convictions pending final resolution of this case; (ii) as to count II, Defendants have permitted Belgard to meet with Native American religious counselors, albeit not with the shama of his choice;[3] and, (iii) as to count III, Defendants have replaced Belgard's lost or destroyed religious articles and permitted him to use and store these replacements in the prison chapel. Finding no evidence in the record to the contrary, the Court agrees and adopts Magistrate Yamashita's recommendation to deny Belgard's motion for a temporary restraining order.

## IV. CONCLUSION

For the foregoing reasons, the Court ADOPTS Magistrate Yamashita's Findings and Recommendation filed November 29, 1994, except as otherwise indicated herein, and REJECTS Defendants' contention that the RFRA is unconstitutional. Belgard's motion for a temporary restraining order is DENIED.

IT IS SO ORDERED.

---

**2.** Defendants do not contend and the Court does not believe that the RFRA fosters government entanglement in or promotion of religion and is thus susceptible to a challenge under the Establishment Clause. *See* Pawa, *Can Congress Save Us?* at 1098. Nor do defendants argue that application of the RFRA in the context of the case at bar, prisoner free exercise cases, would go beyond posing an additional administrative burden to prison officials and judicial resources to "restrict, abrogate or dilute" the constitutional rights of other persons under *Morgan.*

**3.** Defendants assert that "[a]fter unsuccessful attempts to negotiate a solution to Thunderfoot's refusal to submit to inspection before brining [sic] her 'medicine bag' into the facility, defendants have recruited and made other Native American Religious counselors available to plaintiff." Supplemental Memorandum in Opposition to Plaintiff's Motion for Temporary Restraining Order at 2.