William ROUSER, Plaintiff,

v.

Theo WHITE, et al., Defendants.

No. Civ. S–93–767 LKK/GGH P.

United States District Court,
E.D. California.

Oct. 28, 1996.

1448

William Rouser, Crescent City, CA, plaintiff in pro. per.

Constance Picciano, Deputy Attorney General, Sacramento, CA, for defendants.

## ORDER

KARLTON, Chief Judge Emeritus.

Plaintiff is a state prisoner proceeding pro se. He filed suit pursuant to 42 U.S.C. § 1983 alleging that he is an adherent of the religion of Wicca and that defendant prison officials violated his rights protected by the First Amendment to the Constitution of the

United States.[1] He seeks both injunctive relief and damages.

Pursuant to the local rules of this court, the matter was referred to a magistrate judge. *See* Local Rule 302(c)(17). The magistrate judge eventually issued Findings and Recommendations, which were premised on the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb. Defendants filed objections in this court claiming that the statute was unconstitutional. Because they had not made that claim before the magistrate judge, the matter was referred back to him to consider it.

Upon remand, notice was given to the United States that the constitutionality of a federal statute had been called into question. *See* Local Rule 133(a). The United States then intervened for the limited purpose of defending the federal statute, but took no position as to the merits of plaintiff's claims.

On March 4, 1996, the magistrate judge issued new Findings and Recommendations which, while making the same recommendations, relied on the First Amendment rather than RFRA.[2] Although opining that the statute was unconstitutional, the magistrate judge determined that he need not reach the issue since the statute was inapplicable to the matter at bar. He premised his conclusion that he need not reach the statute's constitutionality on his analysis that the statute established a higher threshold for requiring a state's justification for restrictions on religious expression than the First Amendment. Both sides objected and asked this court not to adopt the magistrate judge's Findings and Recommendations.

The issues tendered are important, subtle and difficult. Believing that plaintiff's pro se status precluded fully informed briefing, the court invited the American Civil Liberties Union of Northern California ("ACLU") to file an amicus curiae brief, to which defendants were permitted to respond. Another round of briefing, including a response by the United States followed, whereupon the matter stood submitted.

## I.

## SCOPE OF REVIEW

A district court judge may designate a magistrate judge to hear and determine any non-dispositive pretrial matters brought by a person seeking habeas relief, *see* 28 U.S.C. § 636(b)(1)(A); Local Rule 302(c)(17), and may refer dispositive motions for Findings and Recommendations. 28 U.S.C. § 636(b)(1)(B); Local Rule 302(a) & (c)(17). The standard employed by the district court in reviewing decisions of the magistrate judge depends upon the character of the underlying decision.

Non-dispositive pre-trial motions referred to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) are reviewed under a clearly erroneous or contrary to law standard. *See* 28 U.S.C. § 636(b)(1)(A); Local Rule 303(f); *United States v. Raddatz*, 447 U.S. 667, 673, 100 S.Ct. 2406, 2411, 65 L.Ed.2d 424 (1980). On the other hand, a magistrate judge's determination concerning matters referred pursuant to 28 U.S.C. § 636(b)(1)(B) are for the most part reviewed *de novo*. Thus, the district court reviews *de novo* those portions of the proposed findings of fact to which objection has been made, 28 U.S.C. § 636(b)(1)(C); *McDonnell Douglas Corp. v. Commodore Business Machines, Inc.*, 656 F.2d 1309, 1313 (9th Cir.1981), *cert. denied*, 455 U.S. 920, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982), and the magistrate judge's conclusions of law, *Barilla v. Ervin*, 886 F.2d 1514, 1518 (9th Cir.1989) (citing

---

1. Plaintiff complains of defendants' failure to permit his use of candles, incense, tarot cards, access to a Wiccan chaplain and *A Witches Bible Compleat,* as well as their refusal to permit group worship and use of the chapel by adherents of his faith.

2. The magistrate judge recommended that summary judgment and a preliminary injunction be granted in favor of plaintiff relative to his use of tarot cards and the Wiccan bible, reserving the question of the sincerity of plaintiff's beliefs for trial if defendants wished to contest it. The magistrate judge further concluded that as to defendants' motion for summary judgment directed to plaintiff's claim to a right to group worship, issues of fact existed which could not be resolved on summary judgment. As to all other claims, the magistrate judge recommended that defendants' motion for summary judgment be granted.

*Britt v. Simi Valley Unified School Dist.,* 708 F.2d 452, 454 (9th Cir.1983)). The court may, however, assume the correctness of that portion of the proposed findings of fact to which no objection has been made and decide the motion on applicable law. *See United States v. Remsing,* 874 F.2d 614, 617 (9th Cir.1989) (citing *Orand v. United States,* 602 F.2d 207, 208 (9th Cir.1979)).[3]

The court is not bound to adopt the magistrate judge's Findings and Recommendations; on the contrary, the court must exercise "sound judicial discretion" in making its own determination on the record. *United States v. Raddatz,* 447 U.S. at 676, 100 S.Ct. at 2412–13. The court may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1)(C); *Remsing,* 874 F.2d at 617.

After the extensive briefing this court has received, I have concluded that I cannot adopt the magistrate judge's conclusions of law. Accordingly, the court proceeds below to its own analysis of the difficult questions this case presents.[4]

## II.

### THE CONSTITUTIONALITY OF RFRA [5]

■ The magistrate judge observed that the Supreme Court applies First Amendment principles upon a finding that a prison regulation "impinges on inmates' constitutional rights." Findings and Recommendations ("F & Rs") at 14 (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64 (1987) and *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987)). He noted, however,

that RFRA speaks in terms of a substantial burden, *see* 42 U.S.C. § 2000bb–1(a) ("Government shall not substantially burden a person's exercise of religion"), and concluded that, under RFRA a plaintiff must demonstrate a higher threshold of interference with religious practices before RFRA's "stringent standards" on government interference apply. He then concluded that he need not resolve the issue of the constitutionality of the statute because in cases where the plaintiff had failed to meet what he had determined was the heavier standard of RFRA, then the lighter burden arising under *O'Lone* and its progeny applied, and the court could thus proceed to resolve the issue on constitutional grounds. F & Rs at 16–17.

The briefing parties have differing views as to whether the case may be resolved without reference to RFRA. The United States contends that because RFRA and the First Amendment "embody different tests or standards, it is foreseeable that a court could find that RFRA does not apply to a particular plaintiff's claims, thereby avoiding the constitutional question...." Supplemental Memorandum of the United States at 3, n. 3. This position conforms to the magistrate judge's view, although it leaves unresolved the issue of whether this is such a case. The ACLU and defendants both contend, but for different reasons, that the question of the constitutionality of RFRA cannot be avoided.

On the one hand, the ACLU argues that the magistrate judge's reading of the statute is faulty, and that RFRA does not require plaintiff to meet a more onerous threshold standard than *O'Lone* and *Turner.* On the other hand, defendants argue that "if RFRA is constitutional, then it provides the applica-

---

**3.** The failure of a party to file objections does not relieve the district court of its obligation to review conclusions of law *de novo. See Barilla v. Ervin,* 886 F.2d 1514, 1518 (9th Cir.1989).

**4.** Although the central factual question of the plaintiff's sincerity is unresolved, the court must nevertheless address the legal issues. If, as defendants contend, plaintiff is not entitled to any relief as a matter of law, no trial on the factual issues is required.

**5.** Since drafting this opinion, it appears that the United States Supreme Court has granted certio-

rari to review the constitutionality of RFRA. This has caused the court to consider staying this matter pending the High Court's resolution of the issue. Because I conclude in the text that issues of fact preclude summary judgment, and because the court will appoint counsel for plaintiff, the court believes that it will be necessary to provide both sides with additional time for discovery and preparation for trial. Accordingly, it appears to the court that sufficient time will elapse that the Supreme Court's resolution will issue before trial.

ble legal test...." Defendants' Response to Amicus Curiae Brief at 1.

■ Before addressing the substantive issue, I must consider whether the canon urging avoidance of constitutional questions applies. It is, of course, true that courts should avoid unnecessary resolution of constitutional questions. *St. Martin Lutheran Church v. South Dakota,* 451 U.S. 772, 780, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981); *DeBartolo Corp. v. Florida Gulf Coast Bldg. and Const. Trades Council,* 485 U.S. 568, 575, 108 S.Ct. 1392, 1397–98, 99 L.Ed.2d 645 (1988). That principle has no application to the matter at bar, however, since avoiding the issue of the constitutionality of RFRA leads to resolution of plaintiff's claims under the First Amendment. Indeed, to the extent the principle of avoidance is applicable, resolution of plaintiff's claims under the statute is to be preferred to resolution under the Constitution. *Lyng v. Northwest Indian Cemetery Protective Assoc.,* 485 U.S. 439, 445–46, 108 S.Ct. 1319, 1323–24, 99 L.Ed.2d 534 (1988).

Moreover, this court must agree with defendants' position that, because the statute provides the prima facie applicable legal test, its initial consideration is required. Put simply, defendants may or may not be right in asserting that the statute is unconstitutional; however, unless it is found unconstitutional the statute supplies the relevant legal standard. In other words, because RFRA provides the prima facie applicable legal standard, it follows that if the magistrate judge is correct that RFRA established a higher threshold standard for plaintiffs seeking to vindicate religious liberty, the court would be obligated to determine whether the Congress could do so without running afoul of the First Amendment. If, on the other hand, the ACLU is right that the statute imposes more stringent standards on the States, the court must determine whether the Congress can do that. In sum, a prerequisite to resolution of the case is a determination of the constitu-

tionality of RFRA. Accordingly, I turn to the question of whether Congress exceeded its power in adopting RFRA.

RFRA was adopted as a response to the decision of a majority of the United States Supreme Court in *Employment Division, Dept. of Human Resources of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), abandoning the exacting standard which the "Court over the years painstakingly has developed ... to test the constitutionality of a state statute that burdens the free exercise of religion." *Id.* at 907, 110 S.Ct. at 1615 (Blackmun, J., *dissenting*).[6] It is this fact of legislative response to constitutional adjudication which defendants perceive as raising questions as to RFRA's viability. The argument underlying all of the state's contentions is that the Congress in RFRA invaded the power of the judiciary to resolve constitutional questions in violation of the doctrine of the separation of powers. For the reasons set forth below, I cannot agree.

The legislative history makes clear that the Congress, in adopting RFRA, did not "purport to legislate the standard of review to be applied by the Federal courts in cases brought under [the Free Exercise Clause]. Instead, it creates a new statutory prohibition on governmental action that substantially burdens the free exercise of religion...." S.Rep. No. 111, 103rd Cong., 1st Sess. at 14 and n. 43 (1993), *reprinted* in 1993 U.S.C.A.N. 1892, 1903–04. As the Ninth Circuit has explained, "[w]hile implicitly criticizing *Smith,* the statute does not present itself as an interpretation of the Constitution overruling *Smith;* rather it consists of a command that must be followed as a matter of federal law." *United States v. Bauer,* 84 F.3d 1549, 1558 (9th Cir.1996). Thus, the only question is whether the Congress has the power to adopt a statute providing greater protection from state interference with the

---

6. The consensus among religious leaders that *Smith* represented a significant departure from established standards vital to their enjoyment of religious liberty led to a campaign for legislative relief, which in turn explains Congress' remarkably quick response and its conclusion that *Smith* "virtually eliminated the requirement that

government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S.C. § 2000bb(a)(4). It is possible to maintain a hope, however forlorn, that the universal condemnation of *Smith* might suggest to the Court that its reconsideration is appropriate.

exercise of religious practice than is provided by current decisions of the Supreme Court interpreting the First Amendment.[7]

In adopting the statute, the Congress specifically relied on its authority under Section 5 of the Fourteenth Amendment and the Necessary and Proper Clause, Article 1, Section 8. S.Rep. No. 111, 103rd Cong., 1st Sess. at 13–14 (1993), *reprinted* in 1993 U.S.C.A.N. 1892, 1903; H.R.Rep. No. 88, 103rd Cong., 1st Sess.[8] The question is whether that reliance suffices. The power of Congress to invoke its authority under Section 5 to provide greater federal protection than the guarantees of the Bill of Rights, has been recognized since at least *Katzenbach v. Morgan,* 384 U.S. 641, 651, 86 S.Ct. 1717, 1723–24, 16 L.Ed.2d 828 (1966). *See also South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 453 n. 9, 96 S.Ct. 2666, 2670 n. 9, 49 L.Ed.2d 614 (1976). Although defendants argue otherwise, both the text and history of Section 5 demonstrate that it was designed to insure that Congress could guarantee by statute the protection of civil rights which had been withdrawn by Supreme Court interpretation of the Constitution. *See Ex parte Commonwealth of Virginia,* 100 U.S. (10 Otto) 339, 345–46, 25 L.Ed. 676 (1879); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 490, 109 S.Ct. 706, 720, 102 L.Ed.2d 854 (1989). Moreover, the High Court in *Smith* itself anticipated and implicitly approved of statutes according greater protection to the exercise of religion

than it was willing to recognize under the First Amendment. As Justice Scalia wrote for a majority of the court, "a society that believes in the negative protection accorded to religious belief can be expected to be solicitous of that value in its legislation as well." *Smith,* 494 U.S. at 890, 110 S.Ct. at 1606. The Congress has done no more than to take the Court at its word and provide the very protection as a matter of legislation that the majority failed to discover in the First Amendment.

■ Defendants alternatively argue that the Congress' power under Section 5 varies with the protection being considered. Thus, they suggest that Section 5's power is broader when dealing with equal protection issues and narrower when dealing with the First Amendment. While they recognize that no case supports that contention, they argue that consideration of the historical background surrounding the adoption of the Fourteenth Amendment supports such a conclusion. I cannot agree.

Certainly nothing in the language of the Fourteenth Amendment itself suggests variances in the scope of Congress' power depending on which constitutional right is being protected. While the text of the Amendment addresses the "equal protection of the laws," in like fashion it addresses the "privileges and immunities of citizens," making no distinction between the two clauses. Indeed, adopting defendants' contention inevitably draws into question the doctrine of incorpo-

---

7. At first blush, it seems difficult to understand why greater protection should be required. The Amendment in unvarnished terms prohibits Congress from making any law prohibiting the free exercise of religion, and that prohibition was extended to the States by virtue of the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). Nonetheless, rather than adhering to the uncompromising language of the Amendment, the High Court has held that, under the most restrictive circumstances, statutes of general application trenching on the practice of religion might pass constitutional muster. *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). In *Smith,* however, the majority abandoned the compelling state interest/least restrictive means test as applied to statutes of general application, explaining that "[a]s a textual matter," 494 U.S.

at 878, 110 S.Ct. at 1599–1600, the test was not required. It may be, as the *Smith* majority suggests, that the test is not compelled as a textual matter, but it is equally clear that the text makes no exception for laws of general application. The underlying premise of *Smith* is that if a law also affects many other things then the law does not prohibit the free exercise of religion, even if that is the law's effect. This conclusion is not only a non sequitur, it also proceeds from a type of formalism unworthy of a court whose responsibility it is to construe the Bill of Rights.

8. The Fourteenth Amendment, of course, prohibits the states from abridging "the privileges or immunities of citizens of the United States." Section 5 provides that "[t]he Congress shall have the power to enforce, by appropriate legislation, the provisions of this article."

ration itself.[9]

Although defendants insist that RFRA is nothing but disguised constitutional adjudication substituting the Congress' understanding of the First Amendment for the courts, that position is not supported by the language of the statute or its legislative history. It is for these reasons that the majority of courts have held RFRA constitutional. *EEOC v. Catholic University of America*, 83 F.3d 455 (D.C.Cir.1996); *Flores v. City of Boerne, Tex.*, 73 F.3d 1352 (5th Cir.1996), *cert. granted*, —— U.S. ——, 117 S.Ct. 293, —— L.Ed.2d —— (1996); *Abordo v. Hawaii*, 902 F.Supp. 1220 (D.Haw.1995); *Sasnett v. Dept. of Corrections*, 891 F.Supp. 1305 (W.D.Wis.1995), *aff'd sub nom, Sasnett v. Sullivan*, 91 F.3d 1018 (7th Cir.1996); *Belgard v. State*, 883 F.Supp. 510 (D.Haw.1995); *Campos v. Coughlin*, 854 F.Supp. 194 (S.D.N.Y.1994).

■ For all the above reasons, I conclude that if RFRA provides greater federal protection for the exercise of religion than the Supreme Court's current interpretation of the First Amendment, its adoption falls within the power of Congress under Section Five of the Fourteenth Amendment. Accordingly, I now turn to the magistrate judge's conclusion that RFRA is more restrictive in its application. Below, essentially agreeing with the arguments made by the American Civil Liberties Union, I conclude that the magistrate judge has misread the statute.

As the ACLU points out, if the magistrate judge's reading of the statute is correct, then the Congress has increased the plaintiff's burden of proof in RFRA from those standards applied in *O'Lone* and *Turner*. Such a result, while possible, clearly would be contrary to Congress' announced intention of restoring protection of religious freedom.

While the Congress carefully provided definitions for many of the significant terms employed in the statute,[10] it did not define what a "substantial burden" meant. Because it was the intent of Congress "to restore the compelling interest test" which existed prior to *Employment Division v. Smith*, and "to guarantee its application to all cases where free exercise of religion is substantially burdened," 42 U.S.C. § 2000bb(b), it seems clear that the terms which themselves have not been defined by Congress must be understood within the context of the free exercise cases preceding *Smith*. As I have previously explained, "when a statute employs a term with a specialized legal meaning relevant to the matter at hand, that meaning governs." *United States v. Hubbard*, 856 F.Supp. 1416, 1420 (E.D.Cal.1994) (quoting *Moskal v. United States*, 498 U.S. 103, 121, 111 S.Ct. 461, 472, 112 L.Ed.2d 449 (1990) (Scalia, J., *dissenting*)). Indeed, the Congress expected the courts to follow this conventional method of ascertaining the meaning of "substantial burden" by reference to prior cases. *See* H.R.Rep. 103–88, 103rd Cong., 1st Sess. (hereinafter "House Report") at 6–7 ("It is the committee's expectation that the courts will look to free exercise of religion cases decided prior to *Smith* for guidance in determining whether or not religious exercise has been burdened. . . .").

Because the Congress specifically referred to *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), I first turn to those cases in examining what a substantial burden is for the purposes of RFRA. In those cases, the Supreme Court asked whether "any incidental burden on the free exercise of appellant's religion may be justified by a 'compelling state interest'," *Sherbert*, 374 U.S. at 403, 83 S.Ct. at 1793,[11] and whether the state's conduct "impinges on fundamental rights and interests, such as those specifically protected

---

9. While *Smith* may well support defendants' implicit contention that no principle of constitutional adjudication, however fundamental, is safe, it is not for a district court to suggest that bedrock decisions are at risk.

10. For instance, the Congress specifically explained that "the term 'exercise of religion' means the exercise of religion under the First

Amendment to the Constitution." 42 U.S.C. § 2000bb–2(4).

11. *Sherbert* dealt with a Sabbatarian who was denied unemployment insurance because of her refusal to work on her religiously ordained day of rest. *See Sherbert*, 374 U.S. at 399–400, 83 S.Ct. at 1791–92.

by the Free Exercise Clause of the First Amendment," *Yoder,* 406 U.S. at 214, 92 S.Ct. at 1532.[12] While recognizing that determining whether a motive is religious "may present a most delicate question," *id.* at 215, 92 S.Ct. at 1533, neither case suggested, as the magistrate judge does, that in order for the burden to be substantial it must restrict a practice central to the orthodox practices of the claimant's sect as determined by a secular authority such as this court.[13]

Nonetheless, there is dicta from the Ninth Circuit which may be read as supporting the magistrate judge's view. The Ninth Circuit, in resolving a pro se prisoner's claim, has said that in order to demonstrate a substantial burden "the religious adherent ... has the obligation to prove that a governmental [action] burdens the adherent's practice of his or her religion ... by preventing him or her from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine." *Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir. 1995) (quoting *Graham v. Commissioner,* 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sub nom Hernandez v. Commissioner,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)).

Contrary to the magistrate judge's reading of the statute and one plausible reading of the dicta in *Bryant,* the Supreme Court has explained that the relevant question is not what others regard as an important religious practice, but what the plaintiff believes. *See Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 2148–49, 104 L.Ed.2d 766 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."); *see also Lewis v. Scott,* 910 F.Supp. 282, 288 (E.D.Tex.1995) ("The question [of the centrality of the bur-

dened practice] can only be answered by examining plaintiff's belief ... [O]ther Muslims' understanding of plaintiff's religious obligations are irrelevant if plaintiff's conception is both different and sincerely held"); *see also Moskowitz v. Wilkinson,* 432 F.Supp. 947, 949 (D.Conn.1977) and *Gallahan v. Hollyfield,* 516 F.Supp. 1004, 1006 (E.D.Va.1981), *aff'd,* 670 F.2d 1345 (4th Cir. 1982). Abjuring inquiry into whether the orthodox interpretation of a religion requires a particular practice, as contrasted with the subjective understanding of the plaintiff as to his religious needs, is required by virtue of the fact that "[c]ourts are not arbiters of scriptural interpretation." *Thomas v. Review Bd. of Indiana Employment Sec. Division,* 450 U.S. 707, 716, 101 S.Ct. 1425, 1431, 67 L.Ed.2d 624 (1981).

Defendants argue that adopting a standard addressed to the subjective beliefs of the plaintiff is contrary to *Bryant*'s clear language and in effect opens the floodgates to bogus claims. Defendants' Response to Amicus Brief at 8. I cannot agree.

While *Bryant* requires that the practice be central to the faith, it does not ask by whose understanding of that faith the centrality of the practice should be measured. For the reasons noted above, that standard cannot be other than the claimant's. *See Ward v. Walsh,* 1 F.3d 873, 878 (9th Cir.1993) ("In religious matters we take judicial notice of the fact that often the keenest disputes and the most lively intolerance exist among persons of the same general religious belief who, however, are in disagreement as to what that faith requires in particular matters."), *cert. denied,* 510 U.S. 1192, 114 S.Ct. 1297, 127 L.Ed.2d 649 (1994), *after remand,* 76 F.3d 390 (9th Cir.1996).

While this court, unlike the ACLU, is not sanguine as to the ease with which bogus claims concerning a subjective state may be weeded out, it does not follow that the difficulty in resolving the question justifies resort

---

**12.** In *Yoder,* members of the Old Amish were fined for refusing to send their children to school after the eighth grade for fear that by "exposing Amish children to worldly influences ..." they would be endangering their integration "into the way of life of the Amish faith community ..." 406 U.S. at 218, 92 S.Ct. at 1534–35.

**13.** Defendants appear to suggest that because they have determined that plaintiff's various requests were not central to Wiccan practice, summary judgment is appropriate.

to the standards of orthodoxy, even assuming they could be ascertained with confidence. First of all, determining whether a particular practice is mandated by the orthodox doctrine of a sect injects the court into religious controversies in a manner that the First Amendment, in restricting the making of law "respecting an establishment of religion," specifically prohibits. Moreover, proving a requisite motive or mental state is hardly an unknown burden on plaintiffs.

■ The law frequently requires proof of a state of mind, and the fact that such proof is always circumstantial has not constituted an insurmountable barrier to conviction for specific intent crimes, or liability for malicious conduct. The issue tendered here is similar and should prove no more difficult than in those other instances.[14]

■ For all the above reasons, I conclude that whether a practice is important to a plaintiff turns on his religious understanding. Thus, a restriction on practices subjectively important to plaintiff's sincerely held religious understanding is a substantial burden within the meaning of RFRA. Given this conclusion, it follows that RFRA's reference to a substantial burden does not create a higher or more difficult standard than *O'Lone* and *Turner.* Given that determination, it also follows that RFRA constitutes the appropriate standard for resolving the matter at bar.

■ Having made that determination, the court notes that the magistrate judge did not resolve the question of the sincerity of plaintiff's beliefs. Indeed, the magistrate judge could not since defendants challenge the sincerity of plaintiff's beliefs, and it is a commonplace of federal practice that a party's state of mind "is not readily susceptible to resolution on a motion for summary judgment." *Richards v. Nielsen Freight Lines,* 602

F.Supp. 1224, 1231 (E.D.Cal.1985), *aff'd,* 810 F.2d 898 (9th Cir.1987).

For all the above reasons, the court will not adopt the magistrate judge's Findings and Recommendations. On the contrary, both plaintiff's and defendants' motions for summary judgment are DENIED in their entirety, as is plaintiff's motion for a preliminary injunction. The matter must be reserved for trial. The court is of the view that it is appropriate for it to retain the case for trial and therefore WITHDRAWS the referral of this matter to the magistrate judge. The court now APPOINTS Sue Christianson of the Civil Rights Clinic of the University of California at Davis as counsel for plaintiff and SETS a Status Conference for December 9, 1996, at 2:00 p.m. in Chambers.

IT IS SO ORDERED.

---

**14.** Religious motive must be proven by circumstantial evidence. As with all such issues, the trier of fact must determine whether the circumstantial evidence suffices to demonstrate the element. For that reason a variety of facts may be relevant on the question. Thus, although I have indicated above that evidence concerning the conventional practice of a particular religion is not determinative, it does not follow that such

evidence is irrelevant to a contested issue of sincerity. Other evidence which may bear on the issue of sincerity includes the testimony of plaintiff, plaintiff's conduct, a demonstrated willingness to forego privileges by virtue of religious commandment, the consistency of plaintiff's adherence, and other evidence reasonably having a tendency to prove or disprove the issue.